**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 03-381 (1) (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE** |
| CARLOUS LINDELL DAILY, | |
| Defendant. | |

Joseph T. Dixon, III, Assistant United States Attorney, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415; for plaintiff.

Carlous Lindell Daily, #39587-048, USP – Victorville, P.O. Box 5300, Adelanto, CA 92301, defendant *pro se*.

Larry Reed, **REED LAW OFFICES**, 2000 Plymouth Avenue North, Minneapolis, MN 55411, trial counsel for defendant.

Craig Cascarano, **CASCARANO LAW OFFICE**, 150 South Fifth Street, Suite 3260, Minneapolis, MN 55402, appellate counsel for defendant.

On May 10, 2005, a jury found defendant Carlous Lindell Daily guilty of one count of conspiring to commit bank robbery, one count of bank robbery, and one count of using a firearm during a crime of violence. The jury acquitted Daily of an additional count of bank robbery and an additional count of using a firearm during a crime of violence. Daily was subsequently sentenced to an aggregate term of imprisonment of 444 months, the minimum of the guideline range as determined at sentencing.. Daily's

conviction was affirmed on direct appeal by the Eighth Circuit Court of Appeals, *see United States v. Daily*, 488 F.3d 796 (8th Cir. 2007), and the Supreme Court denied Daily's petition for writ of certiorari on February 19, 2008. On January 28, 2009, Daily filed this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, and subsequently filed a motion to amend the pleadings. For the reasons given below, Daily's motions are denied.[1]

## BACKGROUND[2]

On November 6, 2003, an indictment was issued charging Daily with (1) conspiring to commit armed bank robberies in Minnesota from January 2003 to March 2003, *see* 18 U.S.C. § 2113(a) and (d); (2) committing an armed bank robbery of an Excel Bank branch on January 29, 2003, *see* 18 U.S.C. § 2113(a) and (d); and (3) committing an armed bank robbery of a U.S. Bank branch on March 28, 2003, *see id*. A second superseding indictment filed on January 3, 2005, charged Daily with using a firearm during a crime of violence in both robberies, *see* 18 U.S.C. § 924(c)(1).

---

[1] The Court finds that an evidentiary hearing on this motion is unnecessary because "the motion and the files and records of the case conclusively show that [Daily] is entitled to no relief." 28 U.S.C. § 2255(b). As set forth below, all of Daily's allegations either are (1) insufficient to entitle him to relief, even if accepted as true; or (2) "contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

[2] Additional recitations of the facts of this case are available both in this Court's denial of Daily's motion for new trial or for acquittal, *United States v. Daily*, No. 03-381, 2005 WL 2063886, at *1 (D. Minn. Aug. 25, 2005), and in the Eighth Circuit's affirmance of that order, *United States v. Daily*, 488 F.3d 796, 797-800 (8th Cir. 2007). The facts are repeated here only to the extent necessary to resolve Daily's motion under § 2255.

Tanya Simmer was a bank teller at the Excel branch, and was present during the January 29, 2003, robbery. Simmer met with the prosecution prior to Daily's trial and indicated that she might be able to identify one of the robbers. The prosecution provided her with a photo array on April 15, 2005, but Simmer merely narrowed the array to three people, including Daily. Several days later, however, Simmer informed the government that she believed she could identify the robber in the photo array, but had not done so initially out of fear.

On April 28, 2005, four days before Daily's scheduled trial date, the prosecution provided Daily's trial counsel, Larry Reed, with notice of Simmer's revelation. On the same day, Daily filed a motion seeking to preclude any identification testimony by victims of the robberies, contending that it was unfair that their identifications[3] had been disclosed so close to the beginning of trial. (Mot. in Limine, Docket No. 121.) On May 2, 2005, the Court denied Daily's motion, noting that the prosecution had made the evidence available to Daily as soon as it emerged. However, the Court granted Daily's request to continue the trial to May 4, and also made it clear that any identifications could be challenged in Daily's cross-examination of the robbery victims.

The prosecution then sought guidance about whether it should once again show Simmer the photo array outside of court, or whether it should simply ask her if she could identify Daily during her testimony. Daily objected to an in-court identification not preceded by another attempt at an out-of-court identification, and the Court permitted the

---

[3] Daily also challenged the prospective identifications of Daily by two other victims. Those identifications are not at issue here.

prosecution to again show Simmer the photo array outside of court. On May 3, the prosecution notified Daily that Simmer had identified him in the photo array as one of the robbers.

On May 4, 2005, the trial began. Daily moved to preclude Simmer's May 3 identification, arguing that he should have had an opportunity to challenge it in a pretrial hearing. The Court denied the motion, noting that Daily would have an opportunity to address Simmer's initial non-identification in cross-examination. On the first day of trial, Simmer testified about the events of the robbery and identified Daily as one of the robbers. Simmer indicated that she saw Daily's nose, upper lip, and eyes during the robbery, and that she saw him "very clearly." (Trial Tr. Vol. II, at 274.) Simmer also testified about her identification of Daily in the photo array the day before. Reed thoroughly cross-examined Simmer on her identification of Daily, with particularly extensive questioning about her failure to identify Daily on April 15. (*See id*., at 265-70.)

On the morning after Simmer's testimony, on May 5, 2005, Reed indicated that he may seek to call an expert to challenge Simmer's explanation for how she identified Daily. Specifically, Reed noted that Simmer had focused on Daily's eyes, when testimony indicated that he was wearing dark glasses on the day of the robbery. Reed never called an expert on this issue.

Later at trial, Bryon Copeland testified that Daily had stayed at Copeland's Twin Cities home when Daily traveled to Minnesota to conduct the robberies. Copeland eventually contacted law enforcement, and participated in phone calls with Daily

recorded by the FBI. The prosecution entered recordings of those phone calls into evidence. (Trial Tr. Vol. II, at 309.) Copeland further testified that Daily told him that he successfully robbed banks in Minnesota. (*Id*., at 315-16.)

Special Agent David Rapp of the Federal Bureau of Investigation ("FBI") was also called to testify by the prosecution. Rapp testified that he had listened to the call between Copeland and Daily, and had heard Daily use a coded phrase encouraging Copeland not to begin cooperating with the government. (Trial Tr. Vol. III, at 468-69.) Reed cross-examined Rapp on his recollection of this conversation, suggesting that when Copeland indicated to Daily that there was an investigation of the robberies, Daily responded that he did not know what Copeland was talking about. (*Id*., at 515-16.) Rapp also testified about Simmer's identification of Daily in the photo array on May 3, 2005. Reed thoroughly cross-examined Rapp about the reliability of Simmer's identification, with questions about whether it was reasonable for Simmer to have recalled Daily's eyes when Daily was allegedly wearing sunglasses on the day of the robbery. (*Id*., at 484-86.)

Reed has filed an affidavit indicating that at various points during the trial, including closing argument, he "experienced some physical difficulties including lightheadedness and dizziness." (Reed Aff., Docket No. 265, Ex. 2, ¶ 2.) Reed indicates that he is "concerned that [his] impairment may have affected the defendants [sic] right to have all matters fully addressed in this case." (*Id*., ¶ 4.)

After brief deliberations, the jury found Daily guilty of (1) conspiracy to commit bank robbery, (2) the Excel Bank robbery, and (3) using a firearm during the Excel Bank

robbery.  The jury acquitted Daily of the U.S. Bank robbery and of the use of a firearm during the U.S. Bank robbery.  Daily subsequently brought a motion for acquittal or for a new trial, arguing, in sum, that (1) the Court improperly admitted evidence of Simmer's pretrial identification of Daily; (2) the verdict rested on the unreliable testimony of Simmer; and (3) he should have had an opportunity to challenge Simmer's identification of Daily in a pretrial hearing.  (Docket No. 151.)  The Court denied this motion.  *See Daily*, 2005 WL 2063886.  Daily subsequently appealed to the Eighth Circuit, again challenging the Court's failure to hold a pretrial hearing where he could challenge Simmer's identification of Daily, and arguing that the out-of-court identification procedure that led to Simmer's identification was impermissibly suggestive and led to an unreliable in-court identification.  The circuit affirmed Daily's conviction, concluding that the circumstances of this case did not require a pretrial identification hearing and that the procedures that led to Simmer's out-of-court identification of Daily were not impermissibly suggestive.  *See Daily*, 488 F.3d 796.

Daily now asks the Court to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.  Daily offers multiple arguments for why he was deprived of constitutionally adequate assistance of counsel, and also contends that the prosecution committed misconduct.  He also asks the Court to grant him leave to amend his § 2255 petition to add an additional basis for his claim of ineffective assistance of counsel.

**ANALYSIS**

**I. INEFFECTIVE ASSISTANCE OF COUNSEL**

"A defendant claiming ineffective assistance of counsel must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant." *Keys v. United States*, 545 F.3d 644, 646 (8th Cir. 2008) (internal quotation marks omitted). "There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006) (internal quotation marks omitted). "To overcome that presumption, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different[;] a reasonable probability meaning a probability sufficient to undermine confidence in the outcome." *Id*. (internal quotation marks omitted). Daily argues that his attorney's performance was constitutionally inadequate in several respects.

**A. Reed's Failure to Object to Simmer's Out-of-Court Photographic Identification**

Daily first argues that Reed should have objected to the manner in which the photo arrays were presented to Simmer before trial. Daily argues that the manner in which these photo arrays were presented was unduly suggestive and likely to produce an unreliable identification at trial. *See generally United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004) (articulating the permissible bounds for the use of photo arrays).

As noted above, however, the propriety of the prosecution's out-of-court identification procedures has already been carefully addressed by the Eighth Circuit. In its opinion on Daily's direct appeal, the circuit considered the procedures that were used outside of court at length, and concluded that they were "not impermissibly suggestive." *Daily*, 488 F.3d at 804. In light of that ruling, even if Reed did not address this issue as thoroughly as Daily wished,[4] the Court cannot conclude that this brought his representation below an objective standard of reasonableness. Ultimately, any reluctance to pursue this matter further would have merely accurately anticipated the eventual judgment of the court of appeals. Accordingly, Daily's motion is denied as to Reed's failure to further address the out-of-court identification procedures employed before trial.

### B. Reed's Failure to Interview Simmer Before Trial

Daily next argues that Reed should have interviewed Simmer before trial. Daily contends that such an interview would have made it clear that Simmer was likely to commit perjury, and would have allowed him to develop a more effective trial strategy.

As set forth above, as a result of the unusual circumstances involving Simmer's photographic identification, Daily did not receive notice that she had identified him – and, in turn, that she would be a critical witness against him at trial – until the day before she testified. This clearly would have presented a difficult strategic question for Reed

---

[4] The Court notes that Reed vigorously challenged Simmer's identification of Daily throughout the trial and in post-trial proceedings. *See, e.g.*, *Daily*, 2005 WL 2063886, at *1 ("Daily first argues that the pretrial identification by photographic display was suggestive, and thus tainted the trial.")

about how to use the limited time available for trial preparation. In light of the fact that Reed already possessed a basic understanding of the inconsistencies in Simmer's identifications of Daily – as well as the fact that there was no guarantee that time spent in pursuit of an interview would be rewarded by Simmer actually agreeing to talk – the Court finds no basis for concluding that Reed's failure to seek an interview in that limited time period made Reed's assistance constitutionally ineffective. *See Forsyth v. Ault*, 537 F.3d 887, 892 (8th Cir. 2008) (noting that strategic decisions such as "that of reasonably deciding when to cut off further investigation" are "virtually unchallengeable" (internal quotation marks omitted)). This Court also fails to see how this decision caused Daily prejudice. In short, Reed vigorously cross-examined Simmer on the plausibility of her identification and on her initial non-identification, and this Court fails to see – and Daily fails to explain – how a pretrial interview could have enhanced that thorough cross-examination enough to impact the verdict. Accordingly, Daily's motion is denied as to Reed's failure to interview Simmer before trial.

### C. Failure to Obtain an Expert

Daily next argues that Reed should have obtained an expert witness to challenge Simmer's identification of Daily. As to the out-of-court identification procedures, as explained above, the Eighth Circuit has already determined that the procedures employed were "not impermissibly suggestive." *See Daily*, 488 F.3d at 804. As to Simmer's identification of Daily in court, as noted above, Simmer testified that during the robbery

she saw Daily's nose, upper lip, and eyes, and saw him "very clearly." (Trial Tr. Vol. II, at 274.) Reed appropriately challenged this recollection in a vigorous cross-examination, and gave the jury a full and fair opportunity to come to its own judgment about Simmer's memory and veracity. In the absence of some clearer explanation of what sort of expert evidence Daily believes would have been helpful, the Court concludes that Reed's strategic choice not to devote further litigation resources to challenging a valid identification procedure – or relatively conventional eyewitness testimony – was well within the broad range of adequate professional assistance. Accordingly, Daily's motion is denied as to Reed's failure to obtain an expert.

### D. Failure to Introduce Rapp's Report

Daily next argues that Reed should have introduced a report written by Rapp describing the identifications (and non-identifications) of the witnesses that occurred before trial. Daily argues that this report would have revealed discrepancies demonstrating that Simmer committed perjury. In support of this argument, Daily points to a side-bar discussion at trial in which the parties and the Court discussed possible inconsistencies between Rapp's report and testimony elicited at trial. (Docket No. 266, at 30.) The subject of this side-bar discussion, however, was not the testimony of Simmer. Rather, it was the testimony of Christine Foster, an employee present for the U.S. Bank robbery.[5] (Trial Tr. III, at 473.) Daily was acquitted of the charges arising out of the

---

[5] While Foster had allegedly identified Daily in a pretrial photo array, she did not identify him in her trial testimony.

U.S. Bank robbery, and it is unclear how the issues surrounding Foster's testimony bear on the positive identification by Simmer. In short, the inconsistencies in Simmer's pretrial identifications were well-known to the jury, and it nonetheless reasonably credited her testimony at trial. Accordingly, Daily's motion is denied as to Reed's failure to introduce Rapp's written report.

### E. Failure to Introduce Allegedly Exculpatory Evidence

Daily next argues that Reed should have introduced a tape of a conversation between Daily and Copeland. Daily points to passages in Reed's cross-examination of Rapp in which Rapp concedes that Daily is heard on the tape indicating that he did not know what Copeland was talking about when Copeland referenced the robberies. Daily contends that this conversation would have helped prove that he was not involved in the robberies. As noted above, however, the recordings of these tapes were introduced into evidence by the prosecution. (Trial Tr. Vol. II, at 309.) In any event, to the extent that Daily believes that Reed should have made greater use of the tapes at trial, the record reflects that Reed focused on the portions of the tape that were potentially favorable for Daily, and did not invite a playing of the tapes that quite likely would have confirmed Rapp's additional, unchallenged testimony that Daily used a coded phrase during the call discouraging Copeland from cooperating with the prosecution. In those circumstances, the Court finds nothing in Reed's failure to make further use of the Copeland call that fell below an objective standard of reasonableness or plausibly changed the outcome of the

trial.  Accordingly, Daily's motion is denied to the extent that it challenges Reed's failure to make further use of the Copeland tape at trial.

### F. Closing Argument

Finally, Daily challenges the adequacy of Reed's closing argument.  Daily argues that Reed failed to address inconsistencies in the prosecution's evidence.  The Court had the opportunity to observe this closing statement and has reviewed a transcript of it in considering this motion.  (*See* Trial Tr. Vol. V, at 733-53.)  The record demonstrates that Reed's statement focused extensively on critical inconsistencies in the testimony of the prosecution's key witnesses.  While Daily has adequately identified several additional minor discrepancies in testimony, the strategy-laden task of constructing a closing statement inevitably involves leaving out certain information or arguments in order to deliver a concise, comprehensible message to lay jurors, and the Court finds nothing in Reed's strategic choices that falls outside of the parameters of constitutionally adequate assistance.  Accordingly, Daily's motion is denied to the extent that it challenges the adequacy of Reed's closing argument.

In sum, the Court finds that none of the alleged deficiencies in Reed's performance – either individually or collectively – are sufficient to violate Daily's right to effective assistance of counsel.

### G. Ineffective Assistance of Appellate Counsel

Daily also argues that his appellate counsel, Craig Cascarano, failed to provide him with constitutionally adequate representation. Daily contends that Cascarano should have (1) argued that his indictment should be dismissed on the grounds that the prosecution vindictively filed a superseding indictment adding new counts; (2) challenged the district court's denial of Daily's request to amend the jury instructions; and (3) sought to have Simmer's testimony stricken.

As to Daily's first claim, "[i]n order to demonstrate prosecutorial vindictiveness, a defendant must show that the superseding indictment containing the additional charges was sought in retaliation for exercising constitutional or statutory rights." *United States v. Punelli*, 892 F.2d 1364, 1371 (8th Cir. 1990). Daily, however, does not contend that he asserted any such right before the filing of his superseding indictment. Thus, there would have been no legal basis for advancing this argument on appeal. As to the jury instructions, Reed approached the bench following the Court's reading of the jury instructions and sought a minor word change in Daily's "theory of the case" instruction. (Trial Tr. Vol. V, at 793-96.) Specifically, Reed was concerned that the instruction may inappropriately imply that Daily had conceded that he was in Minnesota at the time of the March robbery. As noted above, however, Daily was acquitted of the charges relating to that robbery. Thus, this issue was moot, and Cascarano appropriately ignored it on appeal. Finally, Cascarano challenged Simmer's testimony on a number of grounds in Daily's appeal, and Daily offers no legal basis for why Simmer's critical testimony

should have been formally stricken. Accordingly, this Court fails to see how Cascarano's approach to challenging Simmer's testimony constituted ineffective assistance of counsel. In sum, Daily's motion is denied to the extent that it contends that Cascarano's appellate assistance was constitutionally inadequate.

### H. Motion for Leave to Supplement the Pleadings

On October 6, 2009, while Daily's § 2255 motion was under submission, Daily filed a "Motion for Leave to Supplement Pleadings Pursuant to Rule 15(a)-(d) Federal Rules of Civil Procedure." (Docket No. 270.) Daily argued that his trial counsel's "performance was deficient for his failure to object under USSG Amendment 599 . . . to the 'six levels' firearm enhancement to the underlying bank robbery, when [Daily] had already been convicted on the [18 U.S.C. § 924(c)] violation in conjunction [with] the same underlying bank robbery." (*Id.* at 2.)

The Court concludes that Daily is not entitled to relief on this ground because he was sentenced under the Career Offender provisions of the U.S. Sentencing Guidelines. The Court calculated his offense level to be 37, pursuant to U.S.S.G. § 4B1.1(b) and the statutory maximum penalty of life imprisonment for Count 4. Therefore, any alleged miscalculation of his offense level with respect to the firearm enhancement had no effect on the offense level before the Court at sentencing. The Court therefore denies the motion.

## II. PROSECUTORIAL MISCONDUCT

Daily also claims that the prosecutor knowingly presented perjured testimony. To establish a constitutional violation arising from the use of false testimony, "the testimony must have been perjured, the government must have known it was, and there must have been a reasonable likelihood that the perjured testimony affected the jury's determinations." *United States v. Milk*, 447 F.3d 593, 601 (8th Cir. 2006) (internal quotation marks omitted). Here, Daily offers nothing more than broad speculation that the prosecuting attorney knew several witnesses would present perjured testimony. In the absence of any evidence or argument beyond this conclusory assertion – or any compelling indications that perjury actually occurred – this Court fails to find anything that merits disturbing the jury's verdict in this case. Accordingly, Daily's motion is denied to the extent that it alleges prosecutorial misconduct.[6]

## III. CERTIFICATE OF APPEALABILITY

The Court may grant a Certificate of Appealability only where the movant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *Tiedeman v. Benson,* 122 F.3d 518, 523 (8th Cir. 1997). To make such a showing, the issues must be debatable among reasonable jurists, a court must be able to

---

[6] The Court adds that Daily briefly contends that he may be entitled to relief in his sentence pursuant to the Supreme Court's decision in *Oregon v. Ice*, 129 S. Ct. 711 (2009). That decision affirms that state courts may assign judges to engage in fact-finding necessary to impose consecutive, rather than concurrent, sentences for offenders convicted of multiple crimes. Daily does not explain *Ice*'s relevance here – in a case where the imposition of consecutive terms of imprisonment was mandated by statute, *see* 18 U.S.C. § 924(c)(1)(D)(ii) – and this Court finds none.

resolve the issues differently, or the case must deserve further proceedings. *See Flieger v. Delo,* 16 F.3d 878, 882-83 (8th Cir. 1994). For purposes of appeal under 28 U.S.C. § 2253, the Court finds it unlikely that reasonable jurists would find the issues raised in Daily's § 2255 motion debatable, or that some other court would decide this § 2255 motion differently. The Court therefore declines to grant a Certificate of Appealability.

## IV.   ORDER TO SHOW CAUSE

In examining Daily's most recent submission, although not raised by Daily, the Court has determined that there may have been an error in calculating the sentencing guideline range. Daily's conviction falls within § 4B1.1(c)(2) of the Sentencing Guidelines, because he is a Career Offender who has "multiple counts of conviction in which at least one of the counts is a conviction other than a conviction for 18 U.S.C. § 924(c)." U.S.S.G. § 4B1.1(c)(2). Therefore, his offense level would be the greater of: (1) "the guideline range that results by adding the mandatory consecutive penalty required by the 18 U.S.C. § 924(c)" count, which is 84 months, "to the minimum and the maximum of the otherwise applicable guideline range determined for the count(s) of conviction **other than** the 18 U.S.C. § 924(c)" count; and (2) "the guideline range determined using the table in" § 4B1.1(c)(3), which is 360 months to life. *See* U.S.S.G. § 4B1.1(c)(2)(A)-(B) (emphasis added). To calculate "the minimum and the maximum of the otherwise applicable guideline range determined for the count(s) of conviction other than the 18 U.S.C. § 924(c)" count, the Court considers Daily's conviction for

Counts 1 and 2, which call for a maximum term of imprisonment of 25 years. 18 U.S.C. §§ 2113(a), (d), 371. Under § 4B1.1(b), the offense level is 34, yielding a sentencing range of 262 to 327 months. Therefore, the Court compares the range of 346 to 411 months (adding 84 months to the sentencing range for Count 2) with the range of 360 months to life. The range of 360 months to life is the greater of the two guideline ranges set forth in § 4B1.1(c)(2) and therefore should have been the applicable guideline range at sentencing.

The Court therefore issues an Order to Show Cause why the Court should not find that Daily's trial and appellate counsel were ineffective in failing to challenge the guideline range recommended by the Pre-Sentence Report and adopted and used at sentencing, which was 444 months to life.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The parties show cause on or before 20 days from the date of this Order why the Court should not find that Daily's trial and appellate counsel were ineffective in failing to challenge the guideline range used at sentencing.

2. Daily's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 [Docket No. 265] is **DENIED**,

3. Daily's Motion for Leave to Supplement Pleadings [Docket No. 270] is **DENIED**, and

4. For the purposes of appeal, the Court does not grant a certificate of appealability.

The Clerk of Court is respectfully directed to mail a copy of this Order to Craig Cascarano, Cascarano Law Office, 150 South Fifth Street, Suite 3260, Minneapolis, MN 55402, appellate counsel for defendant

DATED: April 23, 2010
at Minneapolis, Minnesota.

                                              s/ John R. Tunheim
                                                 JOHN R. TUNHEIM
                                           United States District Judge